UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-CR-10082-WGY |
| | ) | |
| v. | ) | VIOLATIONS: |
| | ) | |
| EILEEN RIGGS, and | ) | 18 U.S.C. § 371 (Conspiracy) |
| MICHAEL FULLER | ) | |
| Defendants | ) | |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times material to this Indictment:

1.    Defendant EILEEN RIGGS (hereinafter referred to as "RIGGS"), a resident of Georgia, was the controller of Premier Holidays International, Inc. (hereinafter referred to as "PHI"), a corporation with a principal place of business in Georgia. In her capacity as controller, RIGGS had primary responsibility for the company's internal accounting system and the monitoring of business receipts and expenses. RIGGS also provided accounting services to PHI as an independent contractor, operating under the name of E.F.R. Services, Inc., a company in which she claimed a sole proprietorship.

2.    Defendant MICHAEL F. FULLER (hereinafter referred to as "FULLER"), a resident of Florida, was the President, and directed the operations of NCC Business Systems, Inc., (hereinafter referred to as "NCC"), and Noble Enterprises, Inc. (hereinafter referred to as "Noble"), both located in West Palm Beach, Florida, where they functioned as collection agencies. NCC was a subsidiary of NCC Business Services, Inc. , located in Jacksonville, Florida.

3.    Daniel DelPiano (hereinafter referred to as "DelPiano"), a resident of Georgia and a

coconspirator, was the President and sole shareholder of PHI. As President, DelPiano directed and controlled the operations of PHI.

4.    PHI was a company engaged in the business of providing vacation club memberships to individuals who, for an annual fee and monthly dues, could obtain discount vacation travel. In most instances, PHI club members financed their membership plan by signing short term consumer promissory notes (typically for 48 or 60 months) payable to PHI (hereinafter referred to as "consumer notes"), which fees were collected by PHI and Conrad Acceptance Corporation (hereinafter referred to as "Conrad"), a collection agency located in California.

5.    MicroFinancial Incorporated (formerly known as Boyle Leasing Technologies, Inc.) and Leasecomm Corporation, a subsidiary of MicroFinancial Incorporated (hereinafter collectively referred to as "MFI"), was a Massachusetts corporation engaged in the business of commercial finance, which was fraudulently induced into providing a $12 million revolving loan (also referred to as a "line of credit") to PHI.

6.    Equity One Financial, Inc. (hereinafter referred to as "Equity One"), was established by DelPiano as a subsidiary of PHI, purportedly engaged in the business of finance and used as a conduit to transfer funds from PHI to NCC and Noble.

7.    PHI maintained several bank accounts controlled by DelPiano, which included but was not limited to: Account No. XXXXXXXXX0355 at First Union Bank, (hereinafter referred to as "PHI First Union account"), Account No. XXXX1700 at Wachovia Bank, (hereinafter referred to as "PHI Wachovia account"), Account No. XXXXX8482 at Fidelity National Bank, (hereinafter referred to as "PHI Fidelity account"), Account No. XXX5609 at Merchants Bank of New York, (hereinafter referred to as "PHI Merchants account"), and Account No. XXXXXX8917 at Colonial

2

Bank (hereinafter referred to as "PHI Colonial account").

8.     Noble maintained a business operating account at Union Planters Bank (Account No. XXXXXX8491), over which account both defendant FULLER and his wife had signature authority, and which was set up as the "lock box" account in order to purportedly deposit PHI membership fees collected by Noble, pursuant to a third-party servicing and collection agreement with PHI and MFI. Noble also maintained three additional bank accounts at Union Planters Bank into which it deposited funds received from PHI and Equity One, specifically Account Nos. XXXXXX8483, XXXXXX8475, and XXXXXX8467.

9.     Equity One maintained two bank accounts controlled by DelPiano, Account No. XXXXXXXXX6718 at First Union Bank and Account No. XXXX1689 at Wachovia Bank (hereinafter referred to as "Equity First Union account" and "Equity Wachovia account," respectively) which accounts were used to transfer funds from PHI to Noble.

## OVERVIEW OF THE SCHEME

At all times material to this Indictment:

10.     All of the individuals identified above, and others known and unknown to the grand jury, participated in an elaborate scheme to defraud MFI through a host of misrepresentations which induced MFI into providing PHI with a revolving loan which was initially for $500,000, then extended on several occasions based on misrepresentations by the defendants, DelPiano, and others, until the line of credit reached $12 million.

11.     The objective of this fraudulent scheme was to obtain a line of credit from MFI through which PHI would receive monies based on false statements and misrepresentations; such false statements and misrepresentations included: (1) that the number of PHI vacation club members was

3

substantially greater than there actually were; (2) that consumer notes used as collateral for the MFI loan were all currently valid and legitimate, when in fact they were not; (3) that membership fees received pursuant to the consumer notes used as collateral were safely deposited into a lock box account controlled by an independent contractor and to be used to make the monthly loan payments due to MFI, when, in fact, the coconspirators used loan proceeds to make payments to MFI (thereby lulling MFI into believing that the line of credit was secure); and (4) the loan proceeds were to be used solely to expand the business of PHI, when, in fact the money was used by DelPiano to invest in diamonds and for other personal purposes.

## COUNT ONE
### (Conspiracy -- 18 U.S.C. § 371)

12.    Paragraphs 1 through 11 are re-alleged and incorporated as if fully set forth herein.

13.    From in or about April 1998 through in or about November 1999, in the District of Massachusetts and elsewhere, defendants

EILEEN RIGGS, and
MICHAEL FULLER,

together with Daniel DelPiano, and others known and unknown to the Grand Jury, did knowingly and willfully, combined, conspired and agreed with each other to knowingly devise and execute a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and, for purposes of executing such scheme or artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, signals and sounds, in violation of Title 18, United States Code, Section 1343 (wire fraud).

4

## MANNER AND MEANS OF THE CONSPIRACY

Among the means and methods by which the defendants and their coconspirators carried out the conspiracy were the following:

14.    It was part of the conspiracy that in or about April 1998, DelPiano sought financing from MFI on behalf of PHI and induced employees from MFI to falsely believe that PHI was a successful vacation club that had close to 20,000 members that were obligated to pay monthly fees pursuant to short term consumer notes, which fees PHI obtained directly or through Conrad, when in fact, as DelPiano well knew, PHI had significantly less members than that represented.

15.    It was further part of the conspiracy that DelPiano falsely represented to MFI that PHI had valid and legitimate consumer notes on which PHI was collecting significant membership fees on a monthly basis, in order to provide the consumer notes to MFI as collateral for a revolving loan, when, in fact, as DelPiano well knew, the amount of fees actually collected on the consumer notes were significantly less than that represented.

16.    It was further part of the conspiracy that defendant RIGGS, knowing that the representations were false, corroborated DelPiano's false representations to employees at MFI regarding the number of PHI members and the amount of fees collected on a monthly basis pursuant to the consumer notes.

17.    It was further part of the conspiracy that DelPiano falsely represented to MFI that the proceeds from the revolving loan would be solely used to expand the business of PHI, when in fact, DelPiano used a significant amount of the loan proceeds to invest in diamonds and for his own personal benefit.

18.    It was further part of the conspiracy that DelPiano falsely represented to MFI that the

5

monthly fees due on the consumer notes that were to serve as collateral for the revolving loan, would be deposited in a separate bank account referred to as a lock box account, which monies were to be used to make the required monthly payment due to MFI on the outstanding loan debt. In fact, no monthly fees generated by the consumer notes were deposited in a lock box account set up by NCC or Noble, nor used to make the loan payments to MFI.

19.    It was further part of the conspiracy that DelPiano fraudulently led MFI to believe that upon the execution of the revolving loan and submission of the consumer notes to MFI, an independent third party would collect the monthly fees due on the consumer notes and cause the fees to be deposited in a lock box account, when, in fact, DelPiano well knew that no independent third party would actually collect any of the PHI membership fees.

20.    It was further part of the conspiracy that in or about August 1998, DelPiano fraudulently recruited defendant FULLER to act as the independent third party to collect the membership fees purportedly generated by the consumer notes, as required under the revolving loan agreement between PHI and MFI, when in fact, neither defendant FULLER nor the company he ran, Noble, had the capacity or ability to collect the membership fees on a monthly basis.

21.    It was further part of the conspiracy that on or about August 6, 1998, in order to obtain a $500,000 revolving loan from MFI, DelPiano signed a Business Loan Agreement, along with other loan documents such as a Security Agreement and Secured Revolving Credit Note, wherein DelPiano falsely represented to MFI that PHI would provide valid, 48 month term consumer notes, which would dictate the amount of the loan extended to PHI and that DelPiano would not use the proceeds of the revolving loan for any business purpose other than to expand PHI.

22.    It was further part of the conspiracy that on or about September 17, 1998, DelPiano

6

signed a third-party Servicing and Collection Agreement, which fraudulently misled MFI into believing that NCC would serve as an independent contractor in collecting the fees due on the consumer notes. In fact, defendant FULLER, acting on behalf of DelPiano, well knew that NCC had not previously handled collection of membership fees on a monthly basis as required by the Servicing and Collection Agreement.

23.    It was further part of the conspiracy that on numerous occasions and on various dates, DelPiano caused defendant RIGGS to mail "batches" of purportedly valid and legitimate original consumer notes, along with security agreement supplements, in an effort to make MFI believe that there was collateral for the revolving loan, when in fact, there was not; and to prompt MFI to release funds to PHI.

24.    It was further part of the conspiracy that defendant RIGGS prepared false and fraudulent periodic reports referred to as "Covenant Compliance to Cash" that purported to provide MFI with the amount of money that had been collected from the consumer notes serving as collateral for the revolving loan, which reports falsely stated that a portion of the funds collected had been used to pay invoices due on the loan to MFI, with the remainder of the money collected returned to PHI. In fact, defendant RIGGS well knew that the amount of money actually collected on the consumer notes was significantly less than the amount of money represented to have been collected in the Covenant Compliance to Cash reports, and defendant RIGGS also knew that such funds had not been used to pay MFI the amount that was due and owing on the outstanding loan debt.

25.    It was further part of the conspiracy that DelPiano, along with defendant RIGGS, fraudulently misled MFI into believing that payments were being timely and completely made pursuant to valid consumer notes submitted to MFI, which induced MFI into increasing the revolving

7

loan amount from $500,000 to $750,000, then to $1 million in October 1998.

26.    It was further part of the conspiracy that defendant FULLER opened a bank account at Union Planters Bank (Account No. XXXXXX8491), to function as the lock box account in which the monthly membership fees collected on the consumer notes would be deposited. Instead, defendant FULLER used such account to deposit funds from the Equity First Union account which DelPiano controlled, and which funds defendant FULLER used to make payments to MFI, in order to mislead MFI into believing that the funds had come from the consumer notes which receivables were supposedly collected by Noble.

27.    It was further part of the conspiracy that on or about December 8, 1998 defendant FULLER signed a second third party Servicing and Collection Agreement, and falsely represented to MFI that Noble would act as an independent contractor in collecting the membership fees due on the consumer notes, when, in fact, as defendant FULLER well knew, Noble did not have the capacity to perform such service, and would not act as an independent contractor.

28.    It was further part of the conspiracy that defendant FULLER was  paid a service fee for his role as the purported "independent contractor" on the MFI revolving loan.

29.   It was further part of the conspiracy that defendant FULLER falsely represented to MFI that Noble would deposit all membership fees collected on the consumer notes in the lock box account set up at Union Planters Bank and use such funds to make the payments due to MFI on the outstanding loan debt, when, in fact, as defendant FULLER well knew, Noble did not collect any membership fees and instead defendant FULLER used proceeds of the loan from MFI provided by DelPiano through the Equity First Union account to make payments to MFI.

30.    It was further part of the conspiracy that in order to increase the amount of the

revolving loan, DelPiano continued to make false representations to MFI, among them being: (1) that the number of PHI memberships with valid and legitimate consumer notes were continuing to increase; (2) that payments on the consumer notes by PHI members were being timely made; (3) that Noble would serve as an independent third party for the collection of membership fees and deposit such fees in the lock box account; (4) that regular monthly loan payments to MFI would be made from the monthly membership fees collected by Noble; and (5) that additional funds were needed for the expansion of PHI's business, which false representations all induced MFI to extend the revolving loan amount from $1 million to $12 million in December 1998.

31.    It was further part of the conspiracy that defendant RIGGS falsely represented to an employee at MFI that PHI needed funds quickly in order to expand its business, when in fact, defendant RIGGS well knew that DelPiano was using a significant portion of the loan proceeds to invest in diamonds.

32.    It was further part of the conspiracy that defendant FULLER caused false and fraudulent periodic reports to be sent to MFI via facsimile and mail, referred to as "Aging Reports," that purported to represent the PHI members who were making monthly payments on the consumer notes, calculating the total fees collected from members for a particular month and which he falsely represented were deposited in the lock box account at Union Planters Bank.

33.    It was further part of the conspiracy that defendant RIGGS traveled from Georgia to the Noble office in West Palm Beach, Florida, to assist defendant FULLER'S wife in the preparation of false and fraudulent "Aging Reports."

34.    It was further part of the conspiracy that defendant FULLER falsely stated to an employee at MFI that PHI members were making timely payments on the consumer notes, when in

9

fact, as defendant FULLER well knew, Noble did not receive any payments from PHI members.

35.    It was further part of the conspiracy that in or about February or March 1999, after DelPiano disclosed to defendant FULLER that there were numerous deficiencies relating to the consumer notes, including that: (1) many of the contracts were canceled and no longer valid; (2) many of the consumer notes contained names of individuals who only visited and provided information to PHI, but never proceeded to sign a consumer note; and (3) many of the contracts had expired and were no longer valid, DelPiano convinced defendant FULLER to continue to assist DelPiano in deceiving MFI into believing that Noble was collecting funds generated by the consumer notes and using those funds to make payments to MFI.

36.    It was further part of the conspiracy that DelPiano used Equity One Financial, Inc. as a conduit to transfer approximately $2.9 million, a portion of the funds received from the MFI revolving loan, to Noble's lock box account held at Union Planters Bank, which money was used to make payments to MFI on the outstanding loan debt.

37.    It was further part of the conspiracy that in August 1999, in order to lull MFI into believing that the $12 million loan would be paid if DelPiano or PHI defaulted on the loan, DelPiano obtained a Business Performance Insurance Policy from Sentinel Insurance Company, for which he signed a security agreement using the consumer notes previously given to MFI as collateral for this performance bond, knowing full well, that the consumer notes were deficient and were not providing the cash flow as represented.

38.    It was further part of the conspiracy that in executing the scheme described above, defendants RIGGS and Fuller, and their coconspirators, through extensive use of interstate wire transmissions, fraudulently induced MFI to loan PHI over $12.5 million, the loss sustained by MFI.

## OVERT ACTS

39.    In furtherance of the conspiracy and to accomplish its objectives, the defendants and other coconspirators in the District of Massachusetts and elsewhere, performed numerous overt acts, including, but not limited to, the following:

a.    On or about April 27, 1998, DelPiano caused a package of information to be sent to the Vice President of Funding at Leasecomm Corporation relating to PHI's membership, the company profile, and three year audited financial statement for PHI.

b.    On or about August 6, 1996, DelPiano signed a Business Loan Agreement, along with other loan documents, in order to obtain a $500,000 revolving loan from MFI.

c.    In or about August 1998, DelPiano solicited defendant FULLER to purportedly serve as an independent third party contractor, in order to collect the membership fees due on the consumer notes, as required by the revolving loan agreement between PHI and MFI.

d.    On or about August 11, 1998, DelPiano caused MFI to wire transfer $95,521.12 to PHI's First Union account.

e.    On or about August 19, 1998, DelPiano caused a "batch" of consumer notes to be mailed to MFI that would serve as collateral for the loan, in order to obtain approximately $42,000 pursuant to the revolving loan agreement.

f.    On or about September 17, 1998, defendant FULLER signed a Servicing and Collection Agreement, providing that NCC would act as the third party independent contractor for the PHI and MFI revolving loan, which he sent via facsimile from Florida to MFI in Massachusetts.

g.    On or about October 7, 1998, DelPiano caused MFI to extend the revolving loan to $750,000.00, pursuant to the same terms and conditions as outlined in the August 6, 1998 Business

Loan Agreement.

h.      On or about October 28, 1998, defendant RIGGS sent to an employee at MFI, a letter regarding "Covenant Compliance to Cash - September, 1998," in which defendant RIGGS falsely attested that $44,500.53 had been collected on the consumer notes, from which amount payment was made to servicing agents and to MFI for the amount due on the outstanding loan debt for the month of September, with the remainder of the monies returned to PHI.

i.      On or about October 29, 1998, defendant RIGGS sent via facsimile from PHI in Georgia, to an employee at MFI in Massachusetts, an accounting of the available line of credit to date remaining on the revolving loan and a summary of the Leasecomm Batch Totals.

j.      On or about December 3, 1998, defendant FULLER caused an account to be opened at Union Planter's Bank (Account No. XXXXXX8491) to serve as the lock box account where PHI membership fees generated by the consumer notes were to be deposited.

k.      On or about December 8, 1998, defendant FULLER, as President of Noble, signed a second Service and Collection Agreement, wherein he falsely represented to MFI that Noble would serve as an independent contractor.

l.      On or about December 9, 1998, DelPiano caused MFI to extend the revolving loan to $12 million, pursuant to the same terms and conditions as outlined in the August 6, 1998 Business Loan Agreement.

m.      On or about December 17, 1998, DelPiano caused a wire transfer of $16,206.44 to be made from the Equity First Union account to the Nobles lock box account held at Union Planters Bank.

n.      On or about December 28, 1998, defendant FULLER caused several wire transfers

12

totaling $17,137.88 to be sent from the Noble's lock box account at Union Planters Bank to MFI as payment on the outstanding loan debt.

      o.    On or about January 18, 1999, defendant RIGGS caused a letter to be sent via facsimile from PHI in Georgia to MFI in Massachusetts, regarding the "Covenant Compliance to Cash - December, 1998," in which defendant RIGGS falsely attested that $78,848.87 had been collected on the consumer notes, from which amount payment was made to servicing agents and to MFI for the amount due on the outstanding loan debt for the month of November, with the remainder of the monies returned to PHI.

      p.    On or about January 21, 1999, DelPiano caused a wire transfer of $145,463.51 to be sent from the Equity First Union account to Noble's lock box account at Union Planters Bank.

      q.    At various times throughout this conspiracy, defendant FULLER falsely represented to an employee at MFI that monthly payments on the consumer notes were being received by Noble, and that there were sufficient funds from those monies to make payment to MFI on the outstanding loan debt.

      r.    On or about March 12, 1999, defendant FULLER, as President of Noble, signed a third Service and Collection Agreement, wherein he falsely represented to MFI that Noble would continue to serve as an independent contractor for the collection of payments made on the consumer notes.

      s.    On or about March 24, 1999, defendant RIGGS sent a letter via facsimile from PHI in Georgia to an employee at MFI in Massachusetts regarding the "Covenant Compliance to Cash - January, 1999" in which defendant RIGGS falsely attested that $193,846.56 had been collected on the consumer notes, from which amount payment was made to servicing agents and to MFI on the

outstanding loan debt for the month of January, with the remainder of the monies returned to PHI.

    t.        On or about April 2, 1999, defendant RIGGS caused a wire transfer of $45,226.32 to be sent from PHI to Noble's lock box account at Union Planters Bank.

    u.        On or about April 22, 1999, defendant RIGGS sent a facsimile from PHI in Georgia to LeaseComm Corp. in Massachusetts relating to financial statements.

    v.        On or about May 5, 1999, DelPiano caused MFI to wire transfer $175,087.21 to PHI's Wachovia account.

    w.        On or about May 17, 1999, DelPiano caused a wire transfer of $110,525.00 to be sent from the Equity Wachovia account to be deposited in the Noble lock box account at Union Planters Bank.

    x.        On or about July 13, 1999, DelPiano caused a facsimile to be sent from PHI in Georgia to LeaseComm Corp. in Massachusetts referring to the obtainment of a $12 million financial performance bond through Sentinel Insurance.

    y.        On or about July 22, 1999, defendant FULLER caused a series of wire transfers totaling $67,924.87, to be sent from the Noble lock box account at Union Planters Bank to MFI, as payment on the MFI loan debt.

    z.        On or about August 9, 1999, defendant FULLER caused a series of wire transfers totaling approximately $109,633.02, to be sent from the Noble lock box account at Union Planters Bank to MFI, as payment on the MFI loan debt.

    aa.        On or about September 14, 1999, DelPiano caused MFI to send a check in the amount of $133,510.50 to PHI's Merchant's account.

    All in violation of Title 18, United States Code, Sections 371 and 2.

A TRUE BILL

_Roger Allen_
FOREPERSON OF THE GRAND JURY

_Carmen M. Ortiz_
Carmen M. Ortiz
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS    March 24 2005

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk
@ 2:20 PM
3/24/05

15

JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

**Place of Offense:** Waltham        **Category No.** I          **Investigating Agency** USPIS

**City** Waltham            **Related Case Information:**   05-cr-10082-WGY

**County** Middlesex        Superseding Ind./ Inf. _____         Case No. _____
                           Same Defendant _____    New Defendant X
                           Magistrate Judge Case Number _____
                           Search Warrant Case Number _____
                           R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   EILEEN RIGGS                    Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address   4311 Rockmart Drive, Kennesaw, GA 30144

Birth date (Year only): 1946  SSN (last 4 #): _____ Sex F Race: Caucasian Nationality: USA

**Defense Counsel if known:**   Steven P. Berne       **Address:** 1349 W. Peachtree St., Suite 1250
                                                        Atlanta, GA 30309-2920

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA** Carmen M. Ortiz            **Bar Number if applicable** 380390

**Interpreter:**   ☐ Yes ☒ No       **List language and/or dialect:** _____

**Matter to be SEALED:**   ☐ Yes ☒ No

          ☐ **Warrant Requested**       ☒ **Regular Process**       ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ in _____ .
☐ **Already in State Custody** _____ ☐ **Serving Sentence** ☐ **Awaiting Trial**
☐ **On Pretrial Release:   Ordered by** _____ **on** _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony 1

Continue on Page 2 for Entry of U.S.C. Citations

☐    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

**Date:** March 24, 2005       **Signature of AUSA:** Carmen M. Ortiz

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    **EILEEN RIGGS** _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 U.S.C. § 371 | Conspiracy | 1 |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

&JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**                     **U.S. District Court - District of Massachusetts**

**Place of Offense:** Waltham        **Category No.** I        **Investigating Agency** USPIS

**City** Waltham        **Related Case Information:** 05-CR-10082-WGY

**County** Middlesex

Superseding Ind./ Inf.        Case No.
Same Defendant        New Defendant X
Magistrate Judge Case Number
Search Warrant Case Number
R 20/R 40 from District of

**Defendant Information:**

Defendant Name  MICHAEL FULLER        Juvenile  ☐ Yes  ☒ No

Alias Name

Address  150 Yale Drive, Lake Worth, FL 33460

Birth date (Year only): 1950  SSN (last 4 #): 9509  Sex M  Race: Caucasian  Nationality: USA

**Defense Counsel if known:**  Samuel J. Montesino        **Address:** 2161 Palm Beach Lakes Blvd.
                                                                   W. Palm Beach, FL 33409

**Bar Number:**

**U.S. Attorney Information:**

**AUSA**  Carmen M. Ortiz        **Bar Number if applicable**  380390

**Interpreter:**  ☐ Yes ☒ No        **List language and/or dialect:**

**Matter to be SEALED:**  ☐ Yes  ☒ No

☐ **Warrant Requested**        ☒ **Regular Process**        ☐ **In Custody**

**Location Status:**

**Arrest Date:**

☐ **Already in Federal Custody as**        in
☐ **Already in State Custody**        ☐ **Serving Sentence**  ☐ **Awaiting Trial**
☐ **On Pretrial Release:**  **Ordered by**        on

**Charging Document:**  ☐ Complaint    ☐ Information    ☒ Indictment

**Total # of Counts:**  ☐ Petty        ☐ Misdemeanor        ☒ Felony  1

**Continue on Page 2 for Entry of U.S.C. Citations**

☐    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
       accurately set forth above.

**Date:**  March 24, 2005        **Signature of AUSA:**  Carmen Sn. Ortiz

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**     MICHAEL FULLER _____

## U.S.C. Citations

| | __Index Key/Code__ | __Description of Offense Charged__ | __Count Numbers__ |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 371 | Conspiracy | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**