UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 05-10082-WGY |
| | ) | |
| MICHAEL FULLER. | ) | |

## ADDENDUM TO OBJECTIONS TO PRESENTENCE REPORT RE: LEGAL ARGUMENT FOR U.S.S.G 3B1.2 WITH DEFENDANT'S WRITTEN ALLOCUTION AND LETTERS OF SUPPORT

**COMES NOW** the Defendant, MICHAEL FULLER, by and through undersigned counsel, and hereby submits the following Addendum which sets forth legal argument regarding the applicability of U.S.S.G §3B1.2 to his case. In addition Michael Fuller also submits his written allocution along with various letters of support.

## LEGAL ANALYSIS- §3B1.2

### *V. Part A.  Offense Level Computation, [Paragraph Number 35]*

The applicability of this adjustment is defined as requiring the defendant be one of "substantially less culpable than the average participant". How MICHAEL FULLER's came to be aware of the fraud being perpetrated by Dan Delpiano has been testified to by MICHAEL FULLER before the Grand Jury on behalf of the United States Government. There is no dispute that MICHAEL FULLER was not  originally involved with Dan Delpiano in his scheme to defraud MFI. There is no dispute that MICHAEL FULLER originally attempted, in good faith,  to fulfill his contractual obligations to Dan Delpiano. It is only when Dan Delpiano finally disclosed MICHAEL FULLER the true nature of the fraud being perpetrated upon MFI could it be argued that MICHAEL FULLER became tangentially connected with the offense as a conspirator.   However, there is also no dispute that at the time Dan Delpiano informed MICHAEL FULLER of what was occurring, Dan Delpiano felt it necessary to tell MICHAEL FULLER that he would be obtaining a separate surety bond in order to absolve MICHAEL FULLER from any further obligations to securing the loan. This clearly evidences that Dan Delpiano was concerned that since MICHAEL FULLER was not

-1-

intimately involved, he needed to be assured that he would soon be absolved from this matter. This begs the question; why would it be necessary for Dan Delpiano to offer a way for MICHAEL FULLER to extricate himself from this matter if MICHAEL FULLER was involved in the fraud from it's inception? MICHAEL FULLER's criminal liability arose because he did not, at the moment he was informed of what was happening , report to either MFI or the authorities what he now knew and instead continued along with the understanding the Dan Delpiano was going to relieve him of any further obligations. Lastly, there is also no dispute that MICHAEL FULLER did not, nor was he, to benefit in any way from the proceeds of Mr. Delpiano's fraud. Any proceeds MICHAEL FULLER was to receive was limited solely to a legitimate servicing agreement.

The Guideline Commission state under application notes 4 and 5 of U.S.S.G. 3B1.2 that this section applies... "to a defendant who plays a minimal role in the concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others is indicative of the role as a minimal participant." In the alternative even if the court concludes that a three level reduction is not warranted at a minimum based upon the foregoing a two-level reduction is warranted under a minor participant designation.

MICHAEL FULLER hereby submits selected pages from his testimony before the Grand Jury in order to establish his initial burden of persuasion for this departure. See Attached Appendix One. MICHAEL FULLER submits that he has clearly met the definitional requirements under this section: 1) Clearly he is the least culpable of the defendants in the conspiracy - He did not benefit in any way from the fraud against MFI.

2) Based upon the fact that Dan Delpiano had to finally disclose to MICHAEL FULLER the fraud he was perpetrating evidences MICHAEL FULLER's.. " lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others is indicative of the role as a minimal participant." Secondly the fact that Dan Delpiano was forced to get an alternate surety for MICHAEL FULLER evidence the fact the MICHAEL FULLER was not intimately involved with the conspiracy.

The purpose of this guideline is to allow for a divergence in sentences between co-defendant's

who are charged in the same indictment but if treated the same would result in a manifest injustice if the court was not allowed to consider their differing liabilities and actions in connection with the offense. Without this reduction, the sentencing guidelines reflect a range of 30 months incarceration for MICHAEL FULLER for a person who was not originally involved in the scheme and stood to earn, at best, what his legal servicing contract called for, roughly $1900. Whereas Dan Delpiano, the person who both created and benefitted entirely from this fraud and pocketed $12,000,000 received a sixty month sentence.

## DEFENDANT'S WRITTEN ALLOCUTION

See Attached Appendix Two.

## LETTERS OF SUPPORT

See Attached Appendix Three.

**WHEREFORE**, based upon the foregoing arguments and authorities, this following Addendum is submitted to this Honorable Court for its consideration prior to sentencing.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to Assistant U.S. Attorney, CARMEN M. ORTIZ, U.S. Attorney's Office, Suite 9200, 1 Courthouse Way, Boston, MA 02210, U.S. Probation Officer, PAMELA J. LOMBARDINI, U.S. Probation Office, Suite 1200, 1 Courthouse Way, Boston, MA 02210, thru facsimile and regular U.S. Mail, this / 4 th day of NOVEMBER, 2005.

Respectfully Submitted,

SAMUEL J. MONTESINO, P.A.
Attorney for the Defendant
2161 Palm Beach Lakes Blvd., Suite 308
West Palm Beach, Florida 33409
Tel. (561)721-3322 / Fax. (561)721-3366

BY:

SAMUEL J. MONTESINO
Florida Bar Number: 0043011

CC:HONORABLE WILLIAM G. YOUNG
Chief U.S. District Court Judge

-3-

# <u>APPENDIX ONE</u>

1

I
1 - 74

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    VS.                   Case No.

JOHN DOE.

                         Federal Grand Jury
                         U.S. Courthouse
                         1 Courthouse Way
                         Boston, Massachusetts

                         Thursday
                         May 27, 2004

APPEARANCE:  CARMEN M. ORTIZ
               Assistant U.S. Attorney

WITNESS:    MICHAEL F. FULLER

ORIGINAL

*APEX Reporting*
(617) 426-3077

FULLER - 05/27/04                                    10

1   him, and he needed to go further in exploring that.  So, we

2   made an appointment to come to my office, he made an

3   appointment to come to my office.

4        Q    Did he come to your office?

5        A    Yes, he did.

6        Q    And can you tell us what happened when you met

7   with him at the office?

8        A    Yes, he had disclosed to me he had a travel club

9   and he had a number of accounts that were accrued with this

10  travel club, accounts receivable for people who belong to

11  that club who paid monthly dues.  And he needed to have

12  those dues collected, not in a collection agency scenario,

13  but in an accounts receivable monthly scenario, which was

14  different than what our, what our work was.

15       Q    Now, Mr. Fuller, I'm just going to get off track

16  here for a moment.  I meant to ask you initially, are you on

17  medication this morning?

18       A    Yes, I am.

19       Q    Okay.  Can you tell us the nature of the

20  medication that you are on?

21       A    Hypertension, Hypertensive heart and anti-stroke.

22       Q    And this medication, did you take it this morning?

23       A    Yes, I did.

24       Q    And does that medication that you take effect your

25  ability to understand my questions?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                    11

1       A    No.

2       Q    Or to answer them accurately as possible?

3       A    It does not negatively effect my ability to answer

4    your questions.  It slows me down a bit.

5       Q    Let me go back to, then, your discussions with Mr.

6    Del Piano.  He explained he had a travel club and that he

7    wanted someone to manage his accounts receivables?

8       A    That's correct.

9       Q    What else did he tell you at that time?

10      A    That he was going to expand into the orlando area

11   in a very big way to expand the travel club up there to key

12   it into the time share business or the time share industry

13   in the Orlando area.

14      Q    Did he explain, at that time, the size of his club

15   or the success level of the club?

16      A    The, the size was 10,000 ring, rings a bell.

17   Again, it's been a while, but I believe it was 10,000 units

18   or 10,000 accounts.  They were paying through electronic

19   means and they were, there as low delinquency, actual

20   collection delinquency.  It was a good portfolio.

21      Q    So, you represent it as a good portfolio?

22      A    Yes, with a low delinquency.

23      Q    Did he indicate if there was anyone else managing

24   those accounts receivable at the time that he was seeking

25   your assistance?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                                    14

1    Q    By the way, when he met you this first time in

2   your office in Florida, was there anyone with him at the

3   time?

4    A    I don't believe so, no.

5    Q    Was there anyone with you?

6    A    My wife.

7    Q    Now, did anything else happen at this -- well, you

8   said you weren't set up for that--

9    A    No--

10    Q    --so, what else did you tell him?

11    A    We had, at that time, been working with another

12   company out of Jacksonville that we were attempting to, to

13   kind of set up an extended phone room for them to take --

14   they had a very high volume of accounts, very new accounts.

15          So, we were going to, kind of, make a joint

16   venture with them.  They were very large, and I thought

17   maybe they might have the skill set to do something like

18   this.

19    Q    What was the name of this company?

20    A    NCC Business Services out of Jacksonville,

21   Florida.

22    Q    So, how did you leave it with Mr. Del Piano at

23   that juncture?

24    A    That I would try to see if it would be possible to

25   put some sort of a system together that would function

*APEX Reporting*
(617) 426-3077

FULLER - 05/27/04                                              18

1   as new member--

2        A    Yes--

3        Q    --accounts--

4        A    Yes--

5        Q    --that would sign up for this travel club?

6        A    Yes.

7        Q    At that point in time, did you think that you, as

8   Noble Enterprise, could do it?

9        A    No.

10       Q    Okay.  So, what happened?

11       A    Once we, we came to a conclusion on what we

12  thought would be an appropriate amount of money for the

13  monthly fee--

14       Q    Which is $2 to $4--

15       A    Two to four dollars an account.  And since it was

16  represented to be a very clean portfolio, very little amount

17  of work required, it would not be very intensive.  We opted

18  for the $2 an account.

19       Q    And what did you do after that?

20       A    Then I went to, or didn't go to, but I spoke with

21  the folks at NCC Business Services in Jacksonville and

22  discussed this with them as another possible avenue of

23  revenue for them.

24       Q    And what happened with -- who did you speak to at

25  NCC?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                    25

1    Q    And why is that?

2    A    Again, because they were using the receivables as

3    collateral for their loan.

4    Q    And so, was it your understanding that once you

5    were put in place, you would be collecting the monthly dues

6    on these consumer notes and from that, those fees that you

7    collected, you would be making payments to Leasecomm; is

8    that correct--

9    A    That is correct--

10   Q    --on what was owed to them based on the loan?

11   A    That's correct.

12   Q    Did you understand or were you aware of the amount

13   that Leasecomm was loaning to Daniel Del Piano?

14   A    At that time, I was not aware of that, no.

15   Q    Do you know if you communicated to Leasecomm your

16   prior dealings or that Mr. Del Piano had come to you?

17   A    Yes, I had discussed that with them.

18   Q    Do you remember that specifically?

19   A    He introduced me to them.  So, I would -- I may

20   have made, that's an assumption, but they didn't, they

21   didn't come to me; I didn't go to them.  So, he had to be

22   the conduit to them.

23   Q    Well, did you have any dealings with a broker by

24   the name of Dan Davis?

25   A    I know the name, but no dealings that I can

FULLER - 05/27/04                                30

1   A   I would say it was--

2   Q   --in Septem-- in the Fall of 1998?

3   A   We didn't know it then, but she was experiencing

4   the same thing I am now, trans TIAs, which are mini-strokes.

5   Q   Mini-strokes?

6   A   Right.

7   Q   So, this is going to be--

8   A   Transient ischemic attack.

9   Q   So, her health was not at its best; correct?

10  A   No, no.  She, the symptom is, she became

11  agoraphobic.  She couldn't, she didn't want to go outside.

12  She stayed in her room all of the time.  She became, kind

13  of, fearful.

14  Q   So, Mr. Fuller, this was going to be a very large

15  project in terms of the receivables of over 10,000 accounts,

16  and initially you had said Nobles couldn't do it; correct?

17  A   That's correct.

18  Q   And you went to NCC, which is a much larger,

19  longer established entity?

20  A   Yes.

21  Q   And they decided they couldn't do it.

22  A   Right.

23  Q   So, now you thought that you could do it?

24  A   Yes, my wife felt that she would be able to.  Yes.

25  Q   Tell us what happened next?

*APEX Reporting*
(617) 426-3077

FULLER - 05/27/04                          38

1   letterhead, number one.

2        A    Yes.

3        Q    And then, it's a letter dated October 7, 1998,

4   sent via facsimile.  Let me direct your attention to the

5   top, here, notation.  It says:  "Noble Enterprises, and then

    a phone number, the fax number."

7        A    Right.

8        Q    Is that the number--

9        A    Yes--

10       Q    --of 561-433-4833 that Noble had at that time?

11       A    Yes.

12       Q    Now, let me direct your attention to the substance

13  of the letter, and it says, October 7, 1998, to Mr. Greg

14  Hines at Leasecomm:  "Dear Greg, Pursuant to our three-party

15  agreement, all of the PHI contracts pledged to Leasecomm

16  have been moved over to NCC for collection activity.

17       "Payments are being received and deposited to the

18  segregated banking account, which has been set up and loan

19  payments to your firm will be made in accordance to the

20  established schedule in that agreement.

21       "I have recently received and reviewed the twelve

22  month payment history for these contracts and it is

23  consistent with NCC's records.  If you need any further

24  clarification, please do not hesitate to contact me."

25            Do you see that?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                                    39

1      A     Yes, I do.

2      Q     Okay.  And then it is signed Michael F. Fuller,

3   President?

4      A     Yes.

5      Q     Is that your signature?

6      A     I do not think so, no.    — Positive

7      Q     Let me show you the notation.  It says -- on the

8   left hand side of the letter--

9      A     My initials and my wife's initials.

10     Q     Those are your initials and your wife's initials?

11  Did your wife type letters for you?

12     A     All of the time, yes.

13     Q     Okay.  And would she note the letter that way MFF

14  with--

15     A     Yes, she would--

16     Q     --MFF with the--

17     A     --that way there.  Yes.  Yes.

18     Q     --is that correct?

19     A     That is correct.

20     Q     But you don't remember signing this?

21     A     No.

22     Q     Do you remember the content of the letter, saying

23  something like this to Leasecomm--

24     A     No--

25     Q     --in October?

FULLER - 05/27/04                                    40

1    A    No.  And as I mentioned to you, it was a few weeks
2    after the contract was signed and Leasecomm was well aware
3    that nothing was happening because Jacksonville hadn't even
4    gotten the systems up and going to attempt to try to take
5    the electronic data by this point.  I think that was what,
6    three weeks after the contracts were signed.

7        Q    I know.  You, that's correct.  It's saying that,
8    it is saying that the contracts pledge, all of the PHI
9    pledged Leasecomm have been moved over for collection
10   activity.  It doesn't say that you've started to collect,
11   but at least it says that the contracts have been moved over
12   and that the payments are going to be made.  But, at least
13   it is indicating, the letter seems to be indicating that the
14   steps are put in place to start collecting these fees.

15       A    And, and--

16       Q    And you're saying that's not happening?

17       A    And, and NCC in Jacksonville was attempting to do
18   that, but never, never successfully got to that point.  No
19   bank accounts were set up.  No transfers of funds per Del
20   Piano, if I remember correctly, was still paying them out of
21   his accounts.

22       Q    Okay.  And you're, so, it's fair to say that the
23   representations in this letter to Leasecomm are false; is
24   that correct?

25       A    Yes.

                         APEX Reporting
                         (617) 426-3077

FULLER - 05/27/04                    41

1    Q    Now--

2    A    But on the other end of it, they obviously, I

3    mean, I don't know where this letter came from.  They knew

4    all along what was going on.

5    Q    All right.  Well, that's October.  Let me direct

6    your attention now to December and January when now a second

7    contract is signed.

8    A    Yes.

9    Q    You do set up a specific bank account that's noted

10   in the agreement--

11   A    Yes--

12   Q    --and you start processing these accounts

13   receivables; correct?

14   A    That's correct.

15   Q    At that time, you represent to Leasecomm that you

16   are going to start collecting these monies, and that doesn't

17   happen?

18   A    No, it doesn't.

19   Q    And you're telling us that Mr. Del Piano told

20   Leasecomm that he wasn't going to allow you to collect the

21   monies or transfer the electronic funds?

22   A    He, he had a great deal of concern that he was

23   going to lose a large percentage of his payers when this

24   occurred.  Not that he was not going to turn it over, but it

25   was not happening in the time frame that they originally

FULLER - 05/27/04                42

1   thought it was going to happen.

2       Q    And it is your impression that Leasecomm was aware

3   of this decision by him?

4       A    Yes.

5       Q    Well, sir--

6       A    That's my impression--

7       Q    --it's fair--

8       A    --yes--

9       Q    Well, sir, it's fair to say that Leasecomm was

10  relying on you to provide them with Aging Reports; correct?

11      A    Yes, that is correct.

12      Q    And let me show you--

13           THE WITNESS:  Ma'am, could I get a little more

14  water?

15           MS. ORTIZ:  Let's just take a brief recess, and

16  I'll have him step out and get some water.

17           THE WITNESS:  Yes, thank you.

18           (Witness leaves at 11:00 a.m. Grand Jury room.)

19           (Witness returns at 11:01 a.m. to stand.)

20           BY MS. ORTIZ:

21      Q    Mr. Fuller, we are going to proceed with your

22  testimony.  I just remind you that you are still under oath-

23  -

24      A    Yes--

25      Q    --and you are the same Michael Fuller that has

FULLER - 05/27/04                43

1   been previously testifying?

2        A    Yes, yes.

3                      (Grand Jury Exhibit No. 37 marked.)

4             BY MS. ORTIZ:

5        Q    Now, let me direct your attention to what has been

6   marked as Grand Jury Exhibit No. 37.  Do you see, I'm just

7   showing it to you on the screen.  Can you see that?

8        A    Yes, I can.

9        Q    Okay.  And I'll just show you the top notation

10  here.  Directing your attention to the top of the document

11  here.  Do you recognize what this represents?

12       A    An Aging Report, yes.

13       Q    Okay.

14       A    An accounts receivable Aging Report.

15       Q    Okay.  And it says here, "Leasecomm Aging as of

16  December 31, 1998"; is that correct?

17       A    That's correct.

18       Q    Okay.  And on the top, again, it shows, it is

19  indicated, Noble Enterprises, Inc. phone number.  It seems

20  to be a fax that was sent with the fax number 561-433-4838?

21       A    Yes.

22       Q    Was that Noble Enterprises fax number?

23       A    Yes.

24       Q    And it seems to have been faxed on January 17,

25  1999?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                           50

1    the time frames, I can't remember, but my wife came to me

2    and said she felt that there was something wrong, that there

3    was a problem and she didn't know what it was, but there was

4    something wrong with the accounts.

5          Specifically, I don't remember what the

6    conversation was, but there was a problem.  And I think, and

7    again, this is from memory, but I believe it was because of

8    information that Eileen had told my wife.

9          Q    You don't, you weren't, did Eileen come to you and

10   explain anything--

11         A    No--

12         Q    --to you?

13         A    No.

14         Q    Okay.  And you don't recall specifically what your

15   wife said?

16         A    No.

17         Q    What did you do as a result of your wife telling

18   you there was a problem?

19         A    I contacted Mr. Del Piano.

20         Q    What did you say to Mr. Del Piano?

21         A    That my wife had been expressing that there was a

22   problem here; it was not working out properly.  The exact

23   conversation, I don't remember, but there was a problem.

24   And then he came--

25         Q    How -- let me, let me hold you right there.  When

FULLER - 05/27/04                                       51

1    your wife came to you that there was a problem, okay, how

2    long had she been preparing the Aging Reports form?  Had it

3    been a month; had it been six weeks?

4          A    It had been a while.

5          Q    You don't know the time frame?

6          A    No, but it had been a while.

7          Q    So you confront--

8          A    I think even Eileen may have come to our office

9    more than once.  I'm trying to remember.  It seems that she

10   came, I'm pretty sure she came more than once, several times

11   over and extended period of time.

12         Q    What happens when you tell Mr. Del Piano there's a

13   problem?

14         A    Mr. Del Piano comes to my office.

15         Q    In West Palm Beach?

16         A    In West Palm Beach, yes.

17         Q    Okay.  Then what happens?

18         A    Mr. Del Piano then discloses to me that there are

19   many deficiencies in these accounts; that there are some

20   that are canceled accounts; there are some that are stale

21   dated, meaning that they are outdated accounts; and some of

22   them were prospective clients that came in and signed up but

23   never proceeded with the club, never went to the sales

24   presentation.  They signed documents, but never proceeded.

25         Q    Never signed on as members?

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                    52

1      A      No.  Or if they signed on as members, they never,

2   it never came to fruition.  They never, they didn't give

3   them any money or whatever.

4      Q      So, he indicated to you that people who may have

5   listened to the sales pitch--

6      A      Yes--

7      Q      --in Atlanta regarding the travel membership club-

8   -

9      A      Yes--

10     Q      --may not have signed on as members in terms of

11  signing a promissory note--

12     A      Yes--

13     Q      --but he used that information--

14     A      That's correct--

15     Q      --to create the consumer notes?

16     A      And also, some of them were from a prior, the same

17  business or prior business up North, either Chicago or

18  Detroit, I'm not sure, but a city in which he ran a similar

19  business.

20     Q      Well, did he tell you what monies he was using to

21  deposit into your account that you were using to pay

22  Leasecomm on the loan?

23     A      The monies that he was receiving from Leasecomm.

24     Q      So, he was using the monies from the loan that

25  were provided to him from Leasecomm to pay back Leasecomm?

FULLER - 05/27/04                          53

1       A    That's correct.

2       Q    At that point in time, and even prior to that, did

3    you know that that was the way it was supposed to happen?

4       A    At that point in time when he disclosed all of

5    this to me?

6       Q    Yes.

7       A    I didn't know any of it until he disclosed it to

8    me then.  I didn't know.  I did not.  Would you repeat that

9    question?

10       Q    Okay.  What monies did you think he was using to

11    deposit into the Union Planters account that you then

12    transferred and paid Leasecomm on the loan?

13       A    Monies being received from the electronic funds

14    transfers from his members.

15       Q    Okay.  But at this juncture, when you confront

16    him, he admits to you that the problems with, perhaps your

17    wife raised, he concedes that these contracts are, there's a

18    problem.  You said that they were stale, some came from

19    another business that he previously had, and some--

20       A    I think it was another travel business.

21       Q    Another travel business.  And you said some of the

22    names used were people who maybe heard the sales pitch, but

23    never really signed on as members?

24       A    Right.  Correct.

25       Q    Okay.  So, there was no money coming in from valid

FULLER - 05/27/04                                    54

1   legitimate contracts?

2         A    He indicated to me that there were some valid

3   legitimate contracts.  Now, how some -- he didn't give me

4   any numbers or anything like that, but there were some that

5   were legit.

6         Q    But, did he tell you, sir, do you remember him

7   telling you the money that, what money he was using to pay--

8         A    Yes--

9         Q    --to deposit in your account?

10        A    That's what he said.  Yes.  That he was using the

11  money that was coming in from Leasecomm to pay into the

12  account.

13        Q    How did you respond?

14        A    I was angry.

15        Q    Why was that?

16        A    I felt I had been duped, put in a very bad

17  situation, and I felt that there was a tremendous amount of

18  stress put on my wife, which eventually turned into, turned

19  her into a vegetable, but.  I didn't know that at the time,

20  but I knew that she was extremely concerned.  I was really

21  ticked.

22        Q    Well, did you pull out of the deal at that point?

23        A    No, I did not.  No.

24        Q    Tell us what happened?

25        A    He asked me if we would stay in.  He asked my wife

APEX Reporting
(617) 426-3077

FULLER - 05/27/04                                55

1   would continue doing what she was doing.  And it was his

2   idea to open up these Orlando showrooms.  And whatever

3   deficient contracts they were, whatever percent of the total

4   were deficient, he would then replace so that Leasecomm

5   would have proper security.

6        Q    And what did you do?

7        A    I agreed to that and agreed to proceed.  I believe

8   at that time or subsequent to that, but not too long after

9   that, he had also indicated that he was pursuing a bond.  He

10  would put up a bond and that would end up being the

11  collateral for the loan.

12       Q    But, sir, at this point, certainly, you don't

13  remember the date, but at this point, there was no question

14  in your mind that Leasecomm was being defrauded into

15  thinking that all of the monies that--

16       A    No, there was no, no question in my mind that he

17  had defrauded them.  I knew from what he was telling me he

18  had done, yes.

19       Q    And you agreed to continue to help him?

20       A    I agreed to proceed with him, yes.

21       Q    So, what happens next?

22       A    My wife and Eileen continued to produce the Aging

23  reports.

24       Q    Did you know at that time, the amount of money

25  that Leasecomm had loaned to--

*APEX Reporting*
(617) 426-3077

FULLER - 05/27/04                    60

1   money to open up offices in Orlando--

2        A    That's correct--

3        Q    --and expand the business?

4        A    That's correct.

5        Q    But rather, he used it to invest in diamonds?

6        A    That's correct.

7        Q    Did he say anything else about the use of the

8   monies?

9        A    No, just that he felt that he would be able to pay

10  the loan off very quickly that way.

11       Q    And how did you react or what did you say when you

12  heard him tell you that he had used some of the monies for

13  diamonds?

14       A    It was just one more disclosure from this guy.  It

15  was just like a never ending story from him.  And it, he had

16  a, what sounded like a reasonable possibility to do it, but

17  again, I thought he had a reasonable possibility to set up

18  the sales offices, too, because he had been very aggressive

19  in the Orlando area -- or I had told he had been looking for

20  space and trying to set up salesrooms.  So, I wasn't sure.

21       Q    After you leave this meeting in Boston, what

22  happens after that?

23       A    The discussion, part of the discussions, if I

24  remember correctly were about the bond.  He would put up a

25  bond and that would be the collateral for the loan, Mr. Del

FULLER - 05/27/04                                          61

1  | Piano would.  And then, he then terminated our services at
2  | the same time he put the bond up, which was very soon.
3  |     Q    Okay.  So, at some point, you were under the
4  | impression that Mr. Del Piano gets a bond, and you are no
5  | longer required to service--
6  |     A    That's correct--
7  |     Q    --these accounts?
8  |     A    That's correct.  And he, I believe, he either
9  | faxed or mailed us the termination letter, Mr. Del Piano
10 | did.
11 |     Q    Is it fair to say that at least through July of
12 | 1999, you continued to make payments to Leasecomm as if you
13 | had been--
14 |     A    Yes--
15 |     Q    --collecting the monies?
16 |     A    Yes, yes, it is.
17 |     Q    After you stopped collecting the monies from Mr.
18 | Del Piano, in terms of the Leasecomm involvement, did you
19 | have any further dealings with Mr. Del Piano?
20 |     A    Yes, I did.
21 |     Q    Tell us about that?
22 |     A    And I can't remember if it was before this or
23 | after it.  I had introduced him to a gentleman that I knew
24 | who, he needed some help in reference to security in Africa
25 | for the diamonds.

*APEX Reporting*
(617) 426-3077

FULLER - 05/27/04                    66

1    Q    --and that you were collecting on these accounts--

2    A    Yes--

3    Q    --is that correct?

4    A    Yes, yes.

5    Q    And you were providing them with these Aging

6    Reports that--

7    A    That's correct--

8    Q    --Ms. Riggs apparently was assisting your wife in

9    preparing?

10    A    That's correct.

11    Q    And in fact, you were paying Leasecomm the payment

12    loan with monies that Del Piano was putting into the Union

13    Planters account?

14    A    That is correct.  I still can't understand why

15    there is two exactly the same contracts signed months apart.

16    I don't know.

17         MS. ORTIZ:  I have no further questions of this

18    witness.  Does anyone else have any questions?

19         THE WITNESS:  Yes, sir.

20         GRAND JUROR:  Were you being paid the $2 per

21    account, for all of the accounts that your wife had listed

22    on that page?

23         THE WITNESS:  Yes.  It was 900 accounts, I

24    believe.  Yes.  Yes, sir.

25         GRAND JUROR:  Did your, how were you in contact

1  data that goes in to see if, on those accounts, or they

2  assume that they were all valid at that time?

3            THE WITNESS: We made an assumption because

4  Leasecomm lent this gentleman this money that they had

5  confirmed that these accounts were, were valid. I mean, I

6  had no believe up until I was told that they weren't. And I

7  assumed that if these guys were going to give them millions

8  of dollars, they knew they were good.

9            Yes, sir.

10           GRAND JUROR: The Aging Report that we saw, I

11  forget which exhibit number it was, it was sent at 7:00 in

12  the evening?

13           THE WITNESS: Um-hum.

14           GRAND JUROR: And you don't think that was sent by

15  your wife?

16           THE WITNESS: It's very highly unlikely.

17           GRAND JUROR: Do you remember if Eileen Riggs was

18  around at that point and could have sent that?

19           THE WITNESS: She was. My wife's condition, kind

20  of, went like shhhhew, to the point that the massive stroke

21  occurred and then that was it. She was in and out of ICUs

22  for probably the next six to eight months. Probably 200

23  days in the hospital after that and now is in a nursing

24  home.

25           GRAND JUROR: The letter that was from Nobles to

FULLER - 05/27/04                              69

1  │ Del Piano, I think that was--

2  │          THE WITNESS:  In October?

3  │          GRAND JUROR:  Yes, that had your signature on or

4  │ signed by somebody--

5  │          THE WITNESS:  Right, right.  It was signed by my

6  │ wife.

7  │          GRAND JUROR:  Could that have been signed by your

8  │ wife, perhaps or by Eileen?

9  │          THE WITNESS:  Yes.  I do not believe -- Eileen

10 │ wasn't there at that time, and it doesn't make sense to me

11 │ because everybody was aware that, that these accounts were

12 │ in the process of being converted in Jacksonville and

13 │ nothing was occurring at -- the letter is contradictory to

14 │ what everybody knew.

15 │          I don't understand how it got generated because

16 │ they were, they were, Leasecomm was well aware of this.

17 │ They were, they were dealing with Jacksonville and they knew

18 │ it wasn't happening, and they knew they were no accounts.

19 │          Yes, sir?

20 │          GRAND JUROR:  You were being paid--

21 │          THE WITNESS:  I'm sorry?

22 │          GRAND JUROR:  You were being paid the $2 on all of

23 │ the accounts that they had--

24 │          THE WITNESS:  No--

25 │          GRAND JUROR:  --or just the ones you had--

APEX Reporting
(617) 426-3077

# APPENDIX TWO

## Michael F. Fuller Sentencing Statement

Your Honor.

I am here today because I took short cuts. My 1st short cut was to believe without
verifying the facts that a Financial Institution would loan 12 million dollars without
confirming it own collateral. In March 1999 Dan Delpiano disclosed that he had
lied to my wife and I about the nature of the collateral he had used to obtain his loan the
year before. He further disclosed that his name was not Delpiano and that his father-in-
law was a ranking member of organized crime. And part of the proceeds from this loan,
were used to fund his African enterprise. He offered a carrot and stick. The carrot was
that he would replace the deficient collateral, with a Bond and terminate our services,
which he did do. If we didn't comply he would bring pressure on my wife and our
Business. At that point I knew I should take some kind of action but cowardice and false
pride stopped me. The end result was that within months my wife suffered an irreparable
stroke due to the immense pressure. Shortly after her stroke our Business vaporized. I
had become the author of our destruction. Eighteen months ago I stood in my wife's
hospital room and watch the terror in her eyes as this horror story came to life again.
After interrogation by the Federal authorities, which culminated with the suggestive
thrust of a gun to my head would facilitate our interview, my life as I knew it had
ended. That same day my pastor came to Irene's room and prayed with us. And it
became crystal clear, that even though my old life was over a new door had opened and I
haven't had a bad day since, including today. I have only respect for the prosecutor and
investigators in this case. As they have help provide a catalysis that has made my life a
100 times better. I would ask for mercy if you so deem it appropriate. If not I would ask
for some time to transfer my wife's care to members of my church and get my affairs in
order as my doctor has painted a very daunting picture of my future.

# **APPENDIX THREE**



*Worldwide Business Intelligence*

The Honorable William G. Young
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

20 September 2005
Re: Michael Fuller
CR#05-10082-WGY

Dear Judge Young:

The purpose of this letter is to provide a character reference for Michael Fuller, who has been charged with Conspiracy and is due to appear before your court regarding this charge.

I am a 24-year veteran of the Central Intelligence Agency's Directorate of Operations. I retired from the CIA as a member of the Senior Intelligence Service with the equivalent rank of Major General (0-8). Since then I have been Chairman of CTC International Group, Inc., a recognized leader in the field of business intelligence. In 2002 my first book, *CIA, Inc.: Espionage and the Craft of Business Intelligence*, was published by Brassey's, Inc.

I have known Mike Fuller for approximately the last 8-10 years. I have found him to be a person of high integrity. He has been scrupulously honest in all of his dealings with me personally, and to the best of my knowledge his reputation within the business community of South Florida is beyond reproach.

His reputation is outstanding. At the present time he is a leader in his church and deeply involved in community affairs, especially with helping orphaned children and teaching martial arts. He is also active in the nursing home community where his sick wife has been confined following a very serious illness.

Although I know very little about the circumstances revolving about these current charges against Mike, I hope you take into consideration the kind of man Mike is before coming to any conclusions regarding his guilt or innocence.

Sincerely,

F. W. Rustmann, Jr.
Chairman

Via Jardin  •  Suite 220  •  330 Clematis Street  •  West Palm Beach, Florida 33401  •  Tel: (561) 655-3111  •  Fax: (561) 655-3001

*Principal Staff Representatives*

LONDON • PARIS • HONGKONG • TOKYO • BANGKOK • FRANKFURT • ADDIS ABABA • CYPRUS • MEXICO CITY

**Robert Levin, M.D.**
10111 West Forest Hill Blvd
Suite 221
Wellington, Fl 33414
Phone: 561-795-0016
Fax: 561-795-5557

September 22, 2005

To: Judge William Young

Re: Michael F Fuller

Dear Judge Young,

I have known Mr. Fuller for approximately 18 years. Mr. Fuller has multiple medical problems including accelerated hypertension, which required a Nephoroloy consultation in order to control his blood pressure. Mr. Fuller's blood pressure still fluctuates greatly. He is on Cardizem CD 120 three time a day and Zestril 20 mg twice a day. Mr. Fuller has also suffered from Transient Ischemic Attacks (TIA'a) mini strokes associated with periods of confusion and left side weakness. Mr. Fuller has seen multiple neurologists, including one at the University of Miami. The patient takes Aggrenox for this condition, as he was unable to tolerate Plavix. Mr. Fuller has severe anxiety secondary to his wife's confinement in a nursing home after having a massive stroke. Mr. Fuller also has chronic pain from a right shoulder injury in the past and from a left lower extremity injury in the past. Mr. Fuller also has chronic respiratory problems, secondary to toxic chemical exposure in the past. Mr. Fuller has lost a significant amount of weight, has quit smoking and abstained from alcohol use. He has refused pain medications or sleep medication. Mr. Fuller needs constant medical supervision to monitor multiple medical problems. He is at high risk for another cardiovascular event. He has been instructed to reduce his workload, reduce stress and cease all travel due to his medical condition. He has been advised if he doesn't comply with all the above referenced requirements, he has a very high risk of a devastating neurological event, resulting in either disability or death

If there is any further information or assistance my office can offer, please do not hesitate to contact me.

Sincerely,

Robert Levin, M.D.



# ALTERNATIVE DISPUTE RESOLUTION OFFICE

**Suite 6.2100, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, FL 33401**

**Court Mediation Services:**

| | |
|---|---|
| Family / Juvenile Dependency Mediation | (561) 355-2739 |
| Circuit Civil / County Mediation | (561) 355-4510 |
| Arbitration / Other Dispute Resolution Services | (561) 355-4510 |

Honorable William G. Young
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

RE: Fuller, Michael
CR#05-10082-WGY

Dear Judge Young:

I have known and worked with Mike Fuller for over 2 years now and can testify that he has recently changed his life in a radical way.

Mike has committed himself to a life of service to others through his new found faith in Jesus Christ. I have been attending a men's Community Bible Study every Tuesday for about 2 years and Mike began coming about six months ago. He is a faithful member of the group and often shares his heart with the other men in the group. Mike has a desire to put the past behind him and live a life which is pleasing to God.

Mike is also assisting our church in the acquisition of forty acres of property. I have worked with Mike on this project for the two plus years I have known him and have grown to know his heart and to love him. I know that Mike is a man with a past, but since his involvement in the church and his commitment to God, Mike has changed his life.

Your Honor, I honestly don't believe that incarceration is a solution which will serve and benefit Mike or society. Therefore, I am respectfully requesting that in your wisdom and the mercy you would be as gracious as possible in your resolution. Thank you for thee opportunity to speak on Mike's behalf. If you have any questions or need further information regarding Mr. Fuller, please feel free to contact me at any time.

Sincerely,

Thomas G. Caprio
Alternative Dispute Resolution Office Director
Palm Beach County Courthouse
205 North Dixie Highway, Suite 6.2100
West Palm Beach, Florida 33401
(561)-355-4512
E-mail  tcaprio@co.palm-beach.fl.us



Judge William Young:                    8/31/05

Irene fuller is 66 years old. She has a diagnosis of Breast mass,
Multiple CVA's, (R)-side Hemiparesis, Pancreatitis and Anemia.
Mrs. Fuller is confined to a wheelchair when out of bed and she
requires staff assist with her Activities of Daily Living. The
Resident cannot express her needs with speech. Irene has been at
Medicana for four years. She cannot participate in Rehab programs
due to the extent of her functional impairment. It is likely that Mrs.
Fuller will reside in a Nursing Home for the remainder of her life.
Mr. Fuller is comfortable with the staff and routine at the Facility.
She is easily upset when the smallest aspect of her routine changes
and she is frustrated when she is unable to respond to make her
wants and needs known or to express herself to others.

                              Dr. Benedicto San Pedro
                              Primary Care Physician



# Pil-Sung Taekwondo

*"WHERE CHAMPIONS ARE MADE"*

August 27, 2005

Dear Judge William Young:

I operate a martial arts school in Lake Worth, FL. We are in the process of creating a not for profit martial arts organization in order to help the underprivileged children in this area. Mr. Fuller has been an integral part of this process. Over the past four years he has donated his time and expertise in order to help with our future dreams. He has helped us obtain demo uniforms for our youngest group (Little Dragons) and has been a large part of our support team because he believes in what we are trying to achieve. Our plans are complex and have been held up by city and county restrictions which Mr. Fuller has also stepped in and done a lot of work on for us. We hope to have our organization operating sometime in the near future and know that this will be more easily facilitated with all the outside help provided by Mr. Fuller. He has been a great believer in our organization and we have found him to be a man of action and integrity. If I can be of any more assistance please do not hesitate to call me (561-588-8424). Thank you.

Sincerely,

Virginia Palhof/President
Pil-Sung Taekwondo

*1515 N. DIXIE HWY. LAKE WORTH, FL 33460*
*(561)588-8424*

*Laurie L. McCoy*

[illegible address lines]

*September 14, 2005*

Honorable William G. Young
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Re: Michael Fuller
CR#05-10082-WGY

Dear Judge Young,

I am writing this letter to express my feelings regarding Michael Fuller.
Mike came into my life about nine months ago through a small home group
bible study. I have spent several hours a week with Mike since that time, I
have found him to be a kind, gentle, caring, GOD fearing man. Mike has
been a true asset to our group. If I ever had a moment of doubt concerning
the question of modern day miracles, Mike is proof that they do still happen.
Mike's wife has experienced a stroke and is currently in a nursing home in
an aphasic state. Mike visits her on a daily basis, he arranges to take her to
church with him weekly, he is a vital part of her connection to the life she
knew. As a health care professional, I feel that is such an important part of
her wellbeing.

I am aware that Mike has been charged with Conspiracy. He has always
been open and, I feel, honest regarding these charges. I belief that the fact
that he was released on his own recognizance speaks volumes in reinforcing
that he is a man of honor.

If a person is guilty of a crime, punishment is necessary. We lean on our
justice system to uphold the laws that are established. Guidelines are in
place to aid in this process. Sometimes black and white and well
sometimes, Your Honor, sometimes in the justice system there are shades of

*gray. I am praying that this is one of those times. Mike's wife Irene, needs him, his church needs him, and society needs him. Mike needs his wife, he needs his church, and I respectfully request that if you could see it in the guidelines of the law, and if you could see it in your heart, that if found guilty, you sentence Mike with leniency.*

*Mike is a new man, a man made new through Jesus Christ. A true witness to the power of GOD. I pray that if it pleases you, his sentence is short, and this truly wonderful man of GOD is allowed to continue the work before him.*

*Thank you, your Honor for your consideration.*

*You are in our prayers daily as you serve our great nation through the justice system.*

*Sincerely,*

*Laurie L. McCoy*

**C. Peter Rainey**
**2908 NW 67th Court**
**Fort Lauderdale, FL 33309**
**Ph: 954-972-6979**

September 15, 2005

Honorable William G. Young
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

RE:  Fuller, Michael
     CR#05-10082-WGY
     Letter of Recommendation

Dear Judge Young:

I have known Michael Fuller for the past three years as both a friend and as a business colleague. One of Mr. Fuller's principal assets (and sometimes a principal liability) is that he is a brutally candid and honest man. He excels at collection work because he comes across as a total professional – quiet and non-threatening, but also purposeful and straightforward.

Mr. Fuller is a self confident and highly resourceful man. He has learned to purge the phrase "can't be done" from his vocabulary. In fact, he is a successful business consultant because he is able to do things, or to cause things to be done, which other men merely talk of doing.

He seems to have boundless energy and great self-control. He has had medical problems for much of his life and he has battled back. He does not drink alcohol, smoke or do drugs and he has managed to lose hundreds of pounds of weight through diet and exercise.

Recently Mr. Fuller has begun to participate in church functions and has become more spiritual. This in turn, has resulted in a kinder, more humble and more forgiving man.

I consider Michael Fuller to be a remarkable man and I am proud to have him as my friend.

Very truly yours,

C. Peter Rainey, B.A., M.B.A., J.D.

**Mark D. Van Horn**
6292 Windlass Circle
Boynton Beach, Fl 33437
561-733-3496
561-733-1205

September 8, 2005

Honorable William G. Young
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

RE: Fuller, Michael
CR#05-10082-WGY

Dear Judge Young,

Michael Fuller has attended South Palm Community Church for the last two years. I have seen him grow in wisdom and understanding and have spent a great deal of time with him. I understand he has lived a life that was not always above reproach, but I firmly believe he is a changed man. I have watched him work tirelessly not only for our church, but also for the Jewish and Muslim communities. He has spoken of the things he has done wrong in his life and I believe he is truly repentant. He knows he may have to go to jail, but I believe he is doing so much good in our community that it would be a shame to loose someone with his dedication. I know his wife is an invalid in a nursing home and there is not anyone else to care for her the way Mike does.
Judge Young, if there is any way you can forgive or reduce Mike's sentence I would be most grateful.

Sincerely,

Mark Van Horn

Honorable William G. Young,

I have known Michael F. Fuller for over two years as his pastor and friend, mentor and confidant. Mike has not only faithfully attended South Palm Community Church but has also been an incredible help to our church as we acquire our new property and begin to build upon it.

This is a strategic time in the life of our church and Mike's experience, dedication and hard work are desperately needed in order for us to advance on our project with regard to zoning, concurrency, etc. He has been working with our church full-time since June 1, 2005 and is a valuable team player.

I have watched Mike develop and grow over the past few years and can honestly tell you that he is not only skilled and efficient in his work, but maintains utmost integrity in his dealings. If there is any possibility that you could allow Mike to continue his service to our church and greater community, that would be an incredible blessing.

Sincerely,

Stan Coleman

Cell # 561-707-5711

**Harold Kraus**
6397 Grand Cypress Circle
Lake Worth, Fl 33463
Phone 561-966-8300

August 29, 2005

**Honorable William G. Young**
Chief United States District Court Judge
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

**Re: Michael Fuller**

Dear Judge Young,

I have known Michael Fuller for over 10 years and have seen him go thru many trying times. He has also helped me thru my personal challenges both marital and health wise.

When I was at JFK Hospital several times he was the first person there and one time, he was the only person who came to assist me. During my marital difficulties he was a stanch supporter and provided help and advise in a calm and even manner.

I have watched as he has on a daily basis cared for his disabled wife and except for times he himself had health problems or business requirement he has been at the hospital or nursing home everyday.

I have witnessed his endless determination to help his community, thru work with the Martial Arts Groups re: Pil Sung Tae Kwon Do Association to help build a non profit operation to reach out to at risk children and his commitment to his church to build a Regional Church with global impact. His conduct and ethics have been above reproach. I would urge you respectfully to allow him to continue his work both personally and professionally in our community.

Sincerely,

Harold Kraus

Harold Kraus

**Connie Huey**

3561 NW 34th Avenue
Lauderdale Lakes, Fl 33306
954-815-4881

September 26, 2005

To: Judge Willam G. Young

Re: Michael Fuller

Dear Judge Young,

I have known Michael Fuller for several years. During that period of time Mr. Fuller has continuously been at his wife bedside, to take care of her needs after her strokes. Mr. Fuller goes to the nursing home to see his wife even when he himself is not feeling well. Irene Fuller has been in a nursing home for several years. Mr. Fuller is a man of his of his word, he always follows through with what he says he will do.

He is a kind hearted man, who is willing to help his community whenever possible. He is very involved with South Palm Community Church. There have been many times he has been able to help families in his Church. Whenever he is assisting his Community he always thinks of the children first, and anyway they will benefit from his actions. Financially he gives as much a possible, in order to assist those who are less fortunate. If Mr. Fuller were not able to continue has work with South Palm Community Church and his Community, he would be missed very much.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Connie Huey

September 20, 2005

Honorable Judge William Young

Dear Judge Young,

I am writing this letter on behalf of a friend of over 10 years, Michael Fuller. I have known him both on a business level and personal level. I have personally had meetings with his church and pastor.

Over the years that I have known Michael, he has been kind, very giving, especially to his wife, Irene, which has been very difficult, under the circumstances.

I am a Eucharistic Minister at my church and pride myself on my relationships. In times of need Michael has always been there for not only me but for my family as well.

It certainly is not my place to Judge anyone, but in this case I ask for leniency for a dear friend that deserves more that he has received.

I thank you for reading this and pray for all of us.

Sincerely'

Vincent Muratore



JUDGE WILLIAM YOUNG:     8/31/05

MR. MICHAEL FULLER HAS VISITED
IRENE FULLER REGULARLY DURING HER
RESIDENCE HERE OVER THE LAST FOUR
YEARS. HE IS ACTIVELY INVOLVED IN
HER CARE FOR MEDICAL ISSUES,
SCHEDULING/APPOINTMENTS, ETC., AS
THEY ARISE. HE BRINGS IN PERSONAL
ITEMS FOR IRENE AND PROVIDES
SUPPORT BY WAY OF HIS VISITS AND
OBSERVED CARING INTERACTIONS WITH
HER. MR. FULLER IS AVAILABLE BY
TELEPHONE, AT WORK AND HOME. HE IS
FAMILIAR WITH FACILTY STAFF AND
APPROPRIATELY ADDRESSES CARE NEEDS
ON IRENE'S BEHALF. CONVERSELY, HE
RESPONDS TO STAFF REQUESTS
REGARDING MRS. FULLER, IN A TIMELY
MANNER. MRS. FULLER HAS FUNCTIONAL
LIMITATIONS BUT PARTICIPATES, TO
THE EXTENT SHE IS ABLE, DUE TO A
STABLE ENVIRONMENT WHERE HER NEEDS
ARE MET IN CONJUNCTION WITH MR.
FULLER'S ATTENTION AND SUPPORT.

JAMIE BADENOCH,
SOCIAL WORKER

*1710 Lake Worth Road • Lake Worth, FL 33460*
*Tel: 561-582-5331 • Fax: 561-582-5354*